Marriott & Hughes, for plaintiff, and the defendant J. A. Geren.
Alex W. Krumm, for John Zettler.
Watson & Burr, for other defendants.

---

## 72                 JUDICIAL SALE OF RAILWAY.

[Clinton Circuit Court, October Term, 1887.]

Smith, Cox and Cherrington, JJ.

(Judge Cherrington, of the Fourth Circuit, taking the place of Judge Swing.)

### *STEPHEN FEIKE v. CINCINNATI & EASTERN RAILWAY CO.

1. RIGHT OF BIDDER TO RETURN OF DEPOSIT TO MAKE GOOD HIS BID.

In an action brought to foreclose a mortgage executed by a railroad company on its railroad and other property, the court entered a decree ordering the sale of the property by a master commissioner. The decree provided that no bid should be received from any person, unless he first made a deposit of $25,000, as a pledge that he would make good his bid in case of its acceptance by the court, and the decree reserved the right to re-sell the property in case the terms of sale were not complied with. A deposit having been made by a person and the property having been struck off to him, and the proceedings having been confirmed by the court, the Master was ordered to convey the property to the purchaser in case he paid the sum of $60,000 in twenty days. This sum was not paid, and the court then ordered the property to be re-sold, with no stipulation that it was to be sold as the property of the purchaser, and at his risk. At such re-sale it sold for a sum greatly in excess of the costs and expenses of the sale and the interest on the amount of the purchase-money, which last sale was duly confirmed. Held, that, there being no stipulation in the first decree for sale that the deposit should be forfeited in case the purchaser failed to comply with the terms of sale, the persons making such deposit were entitled to have the same returned to them, and that the mortgagee had no right thereto.

2. DIVISION OF DEPOSIT AMONG MEMBERS OF A POOL.

When such bid and deposit were made by, and for the benefit of a pool, composed of persons holding a large amount of the bonds of said company, secured by the mortgage, and which pool was formed to protect their interests in said railroad and the said bonds; and such pool was dissolved when it appears that such purchase could not be completed, the members thereof are entitled to such deposit in proportion to the amount of bonds held by them which had been put into such pool.

3. TRANSFER OF INTEREST IN THE BID ASSIGNED NO INTEREST IN THE DEPOSIT.

Where certain members of such pool, after its dissolution, authorized in writing two of the members thereof to sell their said bonds at a certain price, and said persons executed to a third person a writing transferring to him the bonds held by them—

---

* An opinion of the Clinton Circuit Court in case of Feike v. O. & N. W. Rd. Co. was affirmed by the supreme court, without report, February 2, 1892. The O. & N. W. Rd. Co. was a defendant in this case. See also *ante* 8, and 3 Ohio Circ. Dec. 000 (s. c. 5 C. C. R., 199.)

selves and those whom they represented, and said writing contained this further provision, "and we do hereby transfer and assign to said H. C. P. all our right and interest in and to a certain bid for and purchase of the C. & E. Railway at the judicial sale thereof," which writing.was signed by said agents, such instrument did not operate to transfer to said assignee any interest in such deposit. It did not transfer the interest of those whom they assumed to represent, because they had no authority from them to sell anything but their bonds. It did not transfer the interest of the signers thereof in the deposit, for this was separate and distinct from an interest in the bid and purchase.

APPEAL from Court of Common Pleas of Clinton county.

SMITH, C. J

On the issues made by the intervening petition of Brigel, Feike and others, and the answer thereto of the Ohio & Northwestern Railroad Company, and of T. Q. Ashburn, trustee for the first mortgage bondholders of the Cincinnati & Eastern Railway Company, we find the following state of facts:

On the 16th day of July, 1885, the court of common pleas of Clinton county, in an action pending in said court for the foreclosure of several mortgages on the railroad and other property and franchises of the said C. & E. Railway Co., entered a decree in said cause ordering the sale of such railroad and other mortgaged property, by a master commissioner therein appointed, and which provided that such master "in making such sale, shall accept no bid from any bidder who shall not first place in his hands a deposit that he will make good his bid, in case of its acceptance by the court, in the sum of $25,000." * * * "And it is further ordered, that of the purchase price so bid, not less than $25,000," * * * "shall be paid in cash, and all such further portions of said purchase price shall be paid in cash, as the court may from time to time direct, in order to meet other claims which the court may adjudge prior in equity to the said first mortgage. And the court reserves the right to re-sell in this case, any or all of the property and franchises herein ordered to be sold, upon failure to comply within twenty days with any order of the court touching such payments of the balance of said purchase-price; and the balance of such purchase-price not required to be paid in cash, may be paid in cash, or the purchaser at said sale shall have the right to satisfy his bid in whole or in part, by paying over and surrendering receiver's certificates, claims against receiver not evidenced by certificate, mortgage bonds against the company, in the order of their priority, as may be fixed (or found) by this court, but without prejudice to the rights of parties contesting any of said certificates or claims—but such claims shall be paid and received at such rate of their face value and accrued interest only, as said claims would be entitled to receive on distribution," * * * "And upon confirmation of the sale, and payment of the purchase-money, and upon compliance with the terms of the sale, the master commissioner is directed to convey to the purchaser or purchasers, all of the property rights and franchises so ordered to be sold."

On the 10th day of July, the owners of $247,000 of the first mortgage bonds of said company, with a view to protect their interests therein, and in said road, formed an association, or pool, as they called it, for that purpose, and appointed three of the members thereof, Stephen Feike, L. A. Brigel and Albert Netter, a committee to act for the interest of the pool, and their bonds to that amount were deposited with the Fidelity Safe Deposit Co., as trustee. To enable this committee to become a bidder at the sale of the railroad, by making a deposit of $25,000, as required by the order of the court, $75,000 of the $247,000 bonds were pledged to secure a loan of $25,000, which sum, on the 1st day of September, 1886, the day fixed for the sale, was deposited by the committee with Gen. Coates, the master commissioner, and at the sale the property was struck off to Albert Netter, at the sum of $900,050, and the sale was returned to him as an individual,

though we find that he was acting simply as a trustee for the association he represented.

The master reported his proceedings to the court, and on October 8, 1886, the court entered a further decree finding that such proceedings and sale by the master were regular and correct, and "that the said proceedings and sale be, and they hereby are approved and confirmed."

It was further ordered therein, that within twenty days from that day, the purchaser should pay into court, to the credit of the cause, the sum of $60,000, and that on the payment thereof, the master should convey the property sold to the purchaser or purchasers, viz: to Netter, his assigns or associates, reserving the right of the court to re-sell the same, as therein afterwards provided for.

It is then stated and adjudged, that this decree of confirmation of the sale of the premises, is upon condition that the purchaser pay into court, to the credit of the cause, the following sums, at the times named, to-wit:

| | |
|---|---:|
| Within forty days, the further sum of | $50,000 |
| On or before January 15th, 1887 | 50,000 |
| On or before March 15th, 1887 | 55,000 |
| On or before May 1st, 1887, with interest from April 1st, 1887 | 200,000 |
| On or before September 1st, 1887, with interest from April 1st, 1887 | 230,025 |
| On or before December 1st, 1887, with interest from April 1st, 1887 | 230,025 |
| | $815,050 |

And this decree gave the same right to the purchaser to pay such parts thereof as were not required to pay prior claims, in the securities of the company, as was stipulated in the order of sale. And it further provided, "and the court hereby reserves the right to re-take possession of, and to re-sell said property upon failure to pay in whole or in part said installments when they became due, and of all of the right of the purchaser thereto. And in case of such re-sale on account of such failure, said purchasers, their associates or assigns, shall forfeit only so much of the purchase-price paid prior to the said re-sale, as will be necessary to make good the deficiency between $900,050, with unpaid interest, and the amount which said railroad, property, rights and franchises shall bring on said re-sale, less the costs of re-selling. But nothing herein shall entitle the said purchaser to have returned to him the sum of $25,000 deposited with the master commissioner, to make good his bid."

Netter failed to pay the $60,000 ordered to be paid October 28, 1886, and on the 30th a rule issued against him, requiring him to show cause on November 6, why the sale should not be set aside, and the property re-sold.

It seeming probable that the scheme on the part of the pool to purchase and pay for the road had failed, at a meeting of the members thereof, on November 19, 1886, a resolution was adopted declaring that the objects of the association be abandoned, and that the bonds should be returned to the several owners, on their paying or securing their *pro-rata* proportion of the $25,000 borrowed to be deposited as aforesaid, and interest thereon, with their proper share of the costs and expenses to date.

At the same time, by an instrument reciting this resolution, and that a proposition had been made for the purchase of their bonds, the subscribers thereto thereby authorized Feike and Brigel to sell the bonds owned by them, at not less than forty per cent. flat, and after paying out of the proceeds received, their *pro-rata* proportion of the money borrowed, and of costs and expenses to date, to pay the balance due them to the respective signers thereof. These signers, together with Feike and Brigel, held and owned $212,200 of the $247,000 first mortgage bonds, which had been in the pool.

On November 20, 1886, Brigel and Feike, acting for themselves (and as they say in the writing that day signed), for those who authorized them to sell their

bonds, did, by a written memorandum signed by them, transfer and assign to H. C. Parsons, $212,200 of said bonds, and it further states that "in consideration of said sale to, and purchase by H. C. Parsons, we do hereby further transfer and assign to said H. C. Parsons, all our right and interest in and to a certain bid for, and purchase of the Cincinnati & Eastern Railway, at the judicial sale thereof, on September 1, 1885, and which bid and purchase was made by Albert Netter in his own individual name, but for the benefit of us, and other first mortgage bond-holders, who had associated themselves together for that purpose."

At the same time, and as part of the transaction, and in consideration thereof, H. B. Morehead, who was the agent of Parsons, and Mr. Bowler, the attorney of Parsons, executed to Brigel and Feike, for themselves and the others for whom they were acting, agreements to indemnify them against any claim for damages on the part of Netter, or other of the bond-holders, by reason of such transfer, and that neither Parsons, or the bond-holders represented by Morehead and Bowler, should, as to their bonds, hold the assignors liable for any deficiency that there might be between the amounts of the two sales, if the road should be re-sold. No other authority was conferred by any of the bond-holders upon Feike and Brigel than was conferred by the written authority we have mentioned.

Shortly after this Parsons filed a pleading, or motion, in the case pending in Clinton county, setting up the purchase by Netter, and alleging that it was for certain bond-holders; that he had purchased $212,200 of the $247,000 bonds owned by said pool, and had obtained an assignment from Brigel and Feike, two of the three members of the committee appointed to make such purchase, of all their interest in the bid and purchase, and asking that the sale be held to be to him and Netter, and offering to pay the full amount of the purchase-money.

No action seems to have been taken on this, but on November 22, 1886, the court entered a decree ordering a re-sale of the property, on account of the default of the purchaser in making the payments as fixed, which sale was to be on substantially the same terms as the first, except that the deposit was to be $200,000. The first sale was not in terms set aside, and there was no provision in the decree that it was to be sold as the property of, or at the risk of, the first purchaser. On the re-sale it was sold for $1,000,000, to the Ohio & Northwestern Railroad Company, and this sale was duly confirmed by the court. The deposit of $25,000, made at the sale of September 1, 1886, had before this been applied, under the order of the court, to the payment of the costs and expenses of the case and the fees of the attorneys of the receiver, and claims that had precedence of the mortgages.

On December 13, 1886, Netter sold to Morehead & Co., agents of Parsons, his pool bonds, and on the same day conveyed to Parsons his interests in the bid for the road. Both Morehead and Parsons then knew of the manner in which Netter had purchased the road for the pool, and that he had no authority to convey more than his individual interest in it. All of the interests of Netter and Morehead are now vested in the O. & N. Railroad Company.

After the second sale, Feike, Brigel and others, members of the pool, filed their intervening petition asserting their right to a part of the deposit of $25,000; and the others mentioned filed answers denying their right. And the question for our decision on the state of facts above found (leaving out of view for the present whether the evidence shows that the transfer of Brigel and Feike to Parsons, of November 20, 1886, should be reformed on the ground of mistake), is, what are the rights of these parties as to the deposit?

The claim of the trustee under the first mortgage is, that it was absolutely forfeited by the default of Netter, and that it was properly applied to the payment of expenses and claims against the company, so as to leave the purchase-money of the second sale to be applied to the payment of the first mortgage, and that it is not nearly enough to pay the amount due thereon, which is true. That of Feike and others is, that it reverts to the purchasers, and that, as they had an

interest in it, as $212,000 is to $247,000, the whole amount of the pool bonds, that they are now entitled to such a proportion of the deposit. The O. & N. W. Railroad Co. claims the whole of it, first, by virtue of the purchase by their assignor from Netter of his bid, and his bonds, and second, by the purchase from the other members of the pool, through Brigel and Feike, of their bonds and their interest in the bid.

On the state of fact found by us, we state our view of the law thus:

First—That the $25,000 having been deposited by the purchasers simply as a pledge that the bid would be made good in case of its acceptance; that when the sale was practically set aside by the court and a re-sale ordered, and it not being adjudged that the property was to be sold as that of the purchasers, or at their risk; and it having, on the re-sale, brought $99,950 more than on the first, which was much more than would pay the costs of the sale, interest, etc., the right of the purchasers at the first sale to the deposit so made was not forfeited, but that, in equity, they are entitled to withdraw the same, and that the trustee of the first mortgage has no right to have it applied to the part satisfaction of his mortgage, or of the claims prior thereto.

Whether, if the property, when re-sold under such a decree, had brought less than the amount at which it was first sold, the deposit would be held to make good the loss, it is not necessary that we should decide; but it is probable it would. This would be just and equitable and the law seems to be quite well settled, that the court ordering the sale may specially provide that a deposit of this kind may be absolutely forfeited, if the terms of sale are not complied with. If this is not done, then the court may order the re-sale of the property as that of the purchaser, and at his risk, in which case, if it sells for less, the deposit might be applied to make up the deficiency, or the first purchaser be liable therefor. But if it sells for more in such case, the purchaser would seem to be entitled to the difference, less the costs of re-sale, interest, etc. But if not sold as the property of the purchaser, but of the mortgagor, and for his benefit, any deposit is not forfeited. We refer to but a few of the many cases cited by counsel for the intervening claimants on these points: The Chancellor v. Gummere, ad'r, 39 N. J. Eq., 582; Same v. Same, 40 Id., 280; Bleeker v. Graham, 2 Ed. Chan. Rep., 647; Hurt v. Jones, 75 Va., 341; Stephens, assignee, v. Magruder, 31 Md., 168; Weast, assignee, v. Derrick, 100 Pa. St., 509; Galpin v. Lamb, 29 O. S., 529.

This Ohio case—Galpin v. Lamb, *supra*—is to the effect that where the court refused to confirm a sale, and ordered the property to be sold again without qualification or condition, that the purchaser might well conclude that the first sale had been abandoned, and that all parties had elected to take the chances of a second sale; which rule is applicable to the case at bar. In the case at bar no claim is made by Feike and Brigel, or by the Ohio & Northwestern Railroad Co., for the large difference between the amount of the two sales. The case seems to have been treated and considered by the court and all the parties in interest as if the sale had in terms been set aside, and the property sold as that of the railway company, and not as that of the purchaser, and that the whole of the proceeds of the sale was to be for the benefit of the fund.

Second—The purchasers at the first sale are entitled to stand on the order of sale under which they purchased, which simply treats the deposit to be made as a pledge. If there was anything, then, in the order of confirmation which purported to change those rights as to this deposit, it should not prejudice them, as they were not, as purchasers, parties to the suit. But, in our judgment, the provisions of that order or decree did not, in any respect, attempt to change the character of the deposit, or deprive the purchasers of any right they might have to reclaim it. It did provide that only so much of the purchase-price paid prior to a re-sale should be forfeited as would be necessary to make good the difference between the amounts of the two sales, but that nothing in that provision should

46       OHIO DECISIONS.       Vol. III.

Clinton Circuit Court.     72

entitle the purchaser to have the $25,000 deposit returned. This, in effect, was simply leaving the rights of the parties to that deposit wholly undetermined.

Third—Mr. Netter having made this bid, purchase and deposit for the benefit of the pool, and not for himself, on his failure to comply with the terms of the sale and of the undertaking, the members had a right to dissolve and abandon it, leaving the parties thereto free, of course, to assert such rights among themselves as they may have had, or any claim of damages one might have against another. When it was so dissolved, the respective parties, on complying with the terms of the dissolution, as to the costs and expenses incurred, and the payment of the loan and interest, would again become the owners in severalty of their respective bonds, and being interested in the deposit in proportion to the amount of their bonds as compared with the whole amount in the pool, they would hold an undivided interest therein.

Fourth—That while the amount of their interest in the deposit was determined by the amount of the pool bonds held by them respectively, yet it was an interest separate and distinct therefrom, and one could be transferred without thereby transferring the other. And therefore, the authority of the other bondholders of the pool, or part of them, to Feike and Brigel to sell their bonds, did not authorize the said agents to transfer their interest in the deposit, or in the bid and purchase, and if the written assignment of November 20, 1887, of said Feike and Brigel to Parsons, undertook to do this, it was wholly unauthorized on their part, and had no such operation or effect.

Fifth—That the transfer by Feike and Brigel to Parsons, by said instrument, of their bonds, did not operate to transfer their interest in the deposit. On further consideration of the question as to the legal effect of the provision therein, transferring to Parsons their interest in the bid and purchase, and after hearing the full argument as to the character of the deposit, as it appears from the orders of the court, we are of the opinion that such assignment did not, by transferring their individual interests in the bid and purchase, transfer their interests in the deposit.

If this was beyond controversy, there would be no necessity for our passing upon the question of fact made on the amended petition of Feike and Brigel praying a reformation of such assignment, and the answer thereto. They claim that it does not truly express the contract between them. That by the proposition made by Parsons, through his agent, accepted by them, and fully carried out by the delivery of the bonds prior to the signing of the transfer, it was agreed and fully understood by all parties, that no interest in the deposit was to pass. That if the purchase was, completed by Parsons, Feike and Brigel and others were to have the right to withdraw their deposit; and Parsons, taking their place, was to pay the whole purchase-money, $900,050. If the property was re-sold the bond-holders ran the risk.

The evidence on this point, though it can hardly be called conflicting, is not so explicit and convincing as could be desired where it is sought to reform a written contract on parol evidence. One of the members of the court, while of the opinion that the strong presumption is that such was the arrangement between the parties, thinks that the evidence is not so clear and explicit as to justify the relief sought. The other members of the court are so strongly impressed from the evidence, that the only object in mentioning the bid was to enable the purchaser to step into their shoes and have it confirmed by the payment by him of the whole purchase-money (as clearly shown by Parsons' answer filed in said cause), or to have the right on behalf of the assignors to ask for a re-sale, and that the assignors were not to transfer any interest in the deposit, that they think the contract should be reformed so as clearly to express such agreement.

The result is that, in our view (whether the contract is so reformed, or not), that 212,200-247,000 of the deposit of $25,000 should be distributed to Feike and

his associates according to their respective interests, and the residue thereof to the O. & N. W. R. R. Company.

E. W. Kittredge and Wm. L. Avery, for Feike et al.

R. B. Bowler, for O. & N. W. R. R. Co.

C. B. Matthews, for trustee of first mortgage.